In the Supreme Court of Georgia

Decided:   September 14, 2015

S15A1150.  SCHMIDT v. THE STATE.

HINES, Presiding Justice.

Lacy Aaron Schmidt appeals his convictions and sentences for malice murder, possession of a firearm during the commission of a crime, and theft by taking in connection with the fatal shooting of Alana May Calahan.  He maintains that it was error to fail to instruct the jury on the law of involuntary manslaughter, that trial counsel was ineffective, and that his sentence constituted cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States.  For the reasons which follow, we affirm.[1]

---

[1] The murder and related crimes occurred on January 31, 2011.  On March 31, 2011, a Columbia County grand jury returned an indictment against Schmidt charging him with malice murder, felony murder while in the commission of aggravated assault, possession of a firearm during the commission of the crime of murder, and theft by taking a handgun.  Schmidt was tried before a jury February 6-9, 2012, and found guilty of all charges.  On March 2, 2012, he was sentenced to life without the possibility of parole for the malice murder, five years in prison for the firearm possession to be served consecutively to the life sentence, and ten years in prison for the theft by taking to be served concurrently with the life sentence; the felony murder verdict stood vacated by operation of law.  A motion for new trial was filed on March 6, 2012, and an amended motion for new trial was filed on February 20, 2014.  The motion for new trial, as amended, was denied on April 23, 2014.  A notice of appeal was filed on April 30, 2014, the case was docketed in this Court for the April 2015 term, and the appeal was submitted for decision on the briefs.

The evidence construed in favor of the verdicts showed the following. On January 31, 2011, fourteen-year-old Alana Calahan was fatally shot while in her home in Columbia County. Schmidt, who was then also fourteen years old, lived nearby on the same street and he and Alana were friends. The two were "boyfriend and girlfriend" for a brief time until Alana's youth pastor advised her that she was too young for such a relationship. Nonetheless, Schmidt spent a lot of time with Alana and her family. About a week before Alana's murder, Schmidt entered the Calahan house when no one in the family was home; Alana was the first to arrive home and noticed that the door to the house was unlocked. Alana's mother asked Schmidt how he got into the house, and Schmidt responded that the door had been left unlocked. The mother did not believe him and angrily told him that he could not come to the house unless she or her husband was there. Schmidt was also forbidden to come over before 5:00 p. m. on week days. The family kept a shotgun and a handgun in the parents' master bedroom, and the children were not allowed to enter the bedroom or touch the guns.

On the day of the murder, as Alana's sister was waiting in the family pickup truck to transport Alana from the school bus drop off location to their

2

house, Schmidt appeared and told the sister that he was not allowed to come over for the next two weeks. After the school bus driver dropped off Alana, the driver saw Schmidt walking nearby; Schmidt had his hands in his pockets and the hood from his jacket was pulled over his head. Immediately after the drop off, Alana was picked up by her sister and taken home. About twenty or thirty minutes later, the sister left the house to pick up their brother from the bus stop. At that time, Alana was at a computer, which was located beside the house's sliding back door. During the approximately ten minutes the sister was gone, Schmidt entered the house, shot Alana in the back of the neck, and dragged her to the woods outside the house. Alana died from the gunshot wound to her neck.

The sister returned and saw Schmidt's shoes inside the house, along with Alana's shoes; it was common practice for family and friends to take their shoes off upon entering the house. The sister observed that the chair that Alana had been sitting in was knocked over and there was blood, later identified as Alana's, all over the carpet. Schmidt came into the house through the front door and told the sister that someone had taken Alana and that he did not know what to do. Schmidt then went outside with Alana's sister and brother, ostensibly to

3

help in the search for Alana.  Schmidt quickly said he spotted Alana, pointed in a certain direction , and led the siblings to Alana's body.  The sister did not believe that Schmidt could have  seen the body from his initial vantage point. Schmidt approached Alana's body, and tried to pull a stick out of her hair; he then "started freaking out saying, oh, my [G]od, now my prints are on her and they're going to think I killed her."  Schmidt did not cry upon seeing the body. The sister unsuccessfully attempted to revive Alana, and called police.

The police arrived to find Alana's sister and brother crying and screaming, but Schmidt displayed absolutely no emotion; indeed, Schmidt acted as if "there was [not] a care in the world."   During police interviews, Schmidt exhibited conduct which raised suspicion, including attempts to cry which appeared to be disingenuous.  After telling the police at least five different stories about what transpired, Schmidt admitted to having taken Alana's father's handgun from the master bedroom, and allegedly accidentally shooting Alana with it as he stood behind her attempting to unload it.  However, it was later determined that in the position of the handgun mechanism as described by Schmidt, 13 pounds of pressure would have to be applied to the trigger in order to fire the handgun. Investigators later searched Schmidt's residence and found a gun box,

4

ammunition, and an owner's manual for the murder weapon. The police determined that it was not possible for Schmidt to have brought the gun box to his home during the brief interval in which Alana was shot, and that he would have had to obtain it beforehand. In Schmidt's book bag, stashed in his bedroom closet, police found other items belonging to the Calahan family, including an iPod, RCA MP3 player, and a digital camera. Alana's house keys were thought to be lost prior to her death, but were found several weeks later under mats on the floor of the Calahan family's pickup, to which Schmidt had access.

1. Schmidt has not enumerated as error that the evidence at his trial was insufficient to sustain his convictions; nevertheless, this Court has reviewed the evidence and finds that it was sufficient to enable a rational trier of fact to find Schmidt guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Schmidt contends that the trial court erred in denying his request to instruct the jury on the lesser charge of involuntary manslaughter in the

commission of an unlawful act, OCGA § 16-5-3 (a).[2] But, the contention is unavailing.

The trial court denied the request because it was untimely[3] and because the court determined that the evidence did not support such a charge. Yet, Schmidt urges that there was evidence to support it because in his custodial statement he related that the gun discharged accidentally as he was standing behind Alana with the gun pointing at her, and that this coupled with the fact that he removed his shoes upon entering her house would have permitted the jury to find that he did not have the intent to commit homicide but that he accidentally caused Alana's death during commission of the offense of reckless conduct.

Pretermitting any issue as to the timeliness of the request, the trial court properly declined to give the instruction as there was no evidence of involuntary manslaughter by the commission of an unlawful act; it is not error to refuse to

---

[2]OCGA § 16-5-3 (a) provides:

A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony. A person who commits the offense of involuntary manslaughter in the commission of an unlawful act, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years.

[3]The request was made following the charge conference and after the trial court e-mailed counsel its intended instructions to the jury.

give a requested instruction to the jury when there is no evidence to support it. *Heyward v. State*, 278 Ga. 342, 343 (2) (602 SE2d 831) (2004). As noted, Schmidt contends that the handgun discharged accidentally as he was attempting to unload it while standing behind the victim with it pointing at her; there is no contention that he intended to fire the weapon or that it was intentionally aimed at the victim. *Lashley v. State*, 283 Ga. 465, 466-467 (2) (660 SE2d 370) (2008). Thus, as the trial court rightly determined, the evidence established either that Schmidt intentionally shot and killed the victim, or that the handgun discharged accidentally, and thus, there was no criminal offense in regard to the shooting. Id. at 467 (2). In the circumstances in which the evidence shows either the commission of the completed offense, in this case malice murder, or the commission of no offense, there is no requirement that the trial court charge the jury on a lesser included offense. Id. The trial court charged the jury on accident, and did not err by refusing to also instruct it on involuntary manslaughter during the commission of the misdemeanor of reckless conduct. Id.

3. Schmidt next contends that his trial counsel was ineffective in her representation because she pursued a defense theory of voluntary manslaughter

7

even though there was no evidence to support the contention that he killed Alana out of a "sudden and irresistible passion," an essential element of voluntary manslaughter. See OCGA § 16-5-2 (a).[4] He argues that in pursuing voluntary manslaughter, trial counsel abandoned the viable defense of involuntary manslaughter "in favor of a concocted defense unsupported by the evidence." He also contends that if trial counsel's request to charge the jury on involuntary manslaughter is determined to be untimely, that would also constitute ineffective representation.

In order for Schmidt to prevail on his claim of ineffective assistance, he must carry the burden as set forth in *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984), that is, that trial counsel's performance was deficient and that, but for the deficiency, there is a reasonable probability of a more favorable outcome at trial. *Torres v. State*, ___ Ga. ___ (771 SE2d

---

[4]OCGA § 16-5-2 (a) provides:

A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

8

894) (2015). For Schmidt to satisfy the first requirement of *Strickland*, he has to overcome the strong presumption that his trial counsel's performance was within the wide range of reasonable professional conduct, and that counsel's decisions were the result of reasonable professional judgment. *Torres v. State* at ___. The reasonableness of such judgment must be assessed from counsel's perspective at the time of trial and under the particular circumstances then existing in the case. Id. As for the second *Strickland* requirement, Schmidt must demonstrate the reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. This Court is to accept the trial court's factual findings and determinations as to credibility unless they are clearly erroneous, but is to independently apply the legal principles to the facts. Id.

It is true that the trial court declined to instruct the jury on voluntary manslaughter because of a lack of evidence to support such an instruction; however, Schmidt's claim of the ineffective assistance of his trial counsel must fail because he cannot satisfy the necessary element of prejudice under

*Strickland*. As noted, he urges that he was prejudiced because trial counsel pursued a bogus theory of voluntary manslaughter rather than a valid one of involuntary manslaughter; indeed, he suggests no defense other than claiming the lesser culpability of involuntary manslaughter. But, it has already been determined that there was no evidence of involuntary manslaughter, so the failure to pursue involuntary manslaughter as a defense could have had no effect on the outcome at trial, and consequently, Schmidt was not prejudiced by the omission. See Division 2, supra. So too, the timeliness or lack thereof of trial counsel's request to charge the jury on involuntary manslaughter could not constitute ineffective representation. At best, the evidence arguably raised the complete defense of accident, and the trial court instructed the jury on that defense. Inasmuch as Schmidt's claim of ineffective assistance of trial counsel must fail for lack of prejudice, this Court need not consider the performance prong of the *Strickland* test. *Jennings v. State*, 282 Ga. 679, 680 (2) (653 SE2d 17) (2007).

4. There is no merit to Schmidt's final contention that his discretionary sentence of life in prison without the possibility of parole was in violation of the

Eighth Amendment's prohibition of "cruel and unusual punishment" because he was a juvenile at the time. *Bun v. State*, 296 Ga. 549, 550-551 (2) (769 SE2d 381) (2015).

Judgments affirmed. All the Justices concur.